Mark D. Fowler (SBN 124235)
mark.fowler@dlapiper.com
**DLA PIPER LLP (US)**
2000 University Avenue
East Palo Alto, CA 94303-2250
T: (650) 833-2000 | F: (650) 833-2001

Kathryn Riley Grasso (SBN 211187)
kathryn.riley@dlapiper.com
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA 92101
T: (619) 699-2700 | F: (619) 699-2701

Martin M. Ellison (SBN 292060)
martin.ellison@dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars, Suite 400, N. Tower
Los Angeles, CA 90067
T: (310) 595-3000 | F: (310) 595-3300

Attorneys for Defendant
Medtronic CoreValve LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Colibri Heart Valve, LLC,<br><br>        Plaintiff,<br><br>   v.<br><br>Medtronic CoreValve LLC,<br><br>        Defendant. | Case No. 8:20-cv-00847-DOC-JDE<br>Hon. David O. Carter<br><br>**DEFENDANT MEDTRONIC COREVALVE LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FRCP 50(b) AND MOTION FOR A NEW TRIAL UNDER FRCP 59** |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................... 1

II.    LEGAL STANDARD ............................................................................... 2

III.    ARGUMENT ........................................................................................... 3

    A.    There Is No Direct Infringement As A Matter Of Law ...................... 3

        1.    There Is No Infringement Of "Pushing Out The Pusher Member From The Moveable Sheath" (DOE Only) ................. 3

        2.    There Is No Infringement Of "Valve Residing Entirely Within An Inner Channel Of The Stent Member" (Literal Only) ......................................................................................... 11

        3.    There Is No Infringement Of "Attached To A Proximal Portion Of The Stent Member" (Literal Only) ........................ 14

    B.    The Evidence Shows No Active Inducement As A Matter Of Law ................................................................................................. 15

        1.    There Is No Evidence That Medtronic Instructs Doctors To Infringe ................................................................................ 15

        2.    There Is No Evidence That Medtronic Specifically Intends Doctors To Infringe ..................................................... 16

    C.    The Paniagua Application Anticipates The '294 Patent As A Matter of Law ................................................................................... 18

    D.    Bessler Renders The '294 Patent Obvious As A Matter Of Law ...... 22

    E.    At Minimum, A New Trial Is Warranted Because The Liability Verdict Is Against The Clear Weight Of The Evidence ................... 23

    F.    The Court Should Order JMOL, Or At Least A New Trial, On Damages ........................................................................................... 23

        1.    Colibri's Evidence Of Damages Was Inadequate ................. 23

        2.    The Court Should Grant Medtronic JMOL That Colibri Failed To Establish A Reasonable Royalty Above Zero Dollars ................................................................................... 30

        3.    At Minimum, The Court Should Grant A New Trial On Damages ................................................................................ 31

IV.    CONCLUSION ...................................................................................... 31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Akeva L.L.C. v. Nike, Inc.*,
   817 F. App'x 1005 (Fed. Cir. 2020) .................................................................21

*Apple Inc. v. Wi-LAN Inc.*,
   25 F.4th 960 (Fed. Cir. 2022) .........................................................................24

*AstraZeneca AB v. Apotex Corp.*,
   782 F.3d 1324 (Fed. Cir. 2015) ................................................................24, 25

*Asyst Techs., Inc. v. Emtrak, Inc.*,
   402 F.3d 1188 (Fed. Cir. 2005) .......................................................................10

*Bamberg v. Dalvey*,
   815 F.3d 793 (Fed. Cir. 2016) ...................................................................18, 20

*Bos. Sci. Corp. v. Johnson & Johnson*,
   550 F. Supp. 2d 1102 (N.D. Cal. 2008)...........................................................31

*Civolution B.V. v. Doremi Labs, Inc.*,
   No. CV14-00962, 2015 WL 11090912 (C.D. Cal. June 4, 2015).....................16

*Commil USA, LLC v. Cisco Sys., Inc.*,
   575 U.S. 632 (2015) .....................................................................................2, 16

*Cordis Corp. v. Bos. Sci. Corp.*,
   188 F. App'x 984 (Fed. Cir. 2006) (unpublished) .....................................20, 21

*DSU Med. Corp. v. JMS Co.*,
   471 F.3d 1293 (Fed. Cir. 2006) .......................................................................17

*Duramed Pharms., Inc. v. Paddock Labs., Inc.*,
   644 F.3d 1376 (Fed. Cir. 2011) .........................................................................7

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
   909 F.3d 398 (Fed. Cir. 2018) ...................................................................24, 25

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002) ....................................................................................8, 17

*Freedman Seating Co. v. Am. Seating Co.*,
   420 F.3d 1350 (Fed. Cir. 2005) .......................................................................10

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) ..................................................................................16, 17

- ii -

*Hagen v. City of Eugene*,
   736 F.3d 1251 (9th Cir. 2013) ............................................................... 2

*Hanson v. Alpine Valley Ski Area, Inc.*,
   718 F.2d 1075 (Fed. Cir. 1983) ..................................................... 25, 26

*Hanson v. Shell Oil Co.*,
   541 F.2d 1352 (9th Cir. 1976) ............................................................... 2

*Hebert v. Lisle Corp.*,
   99 F.3d 1109 (Fed. Cir. 1996) ............................................................ 23

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
   523 F.3d 1304 (Fed. Cir. 2008) ............................................................ 6

*Krippelz v. Ford Motor Co.*,
   667 F.3d 1261 (Fed. Cir. 2012) .......................................................... 29

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) .............................................................. 27

*LG Elecs., Inc. v. Advance Creative Comput. Corp.*,
   212 F. Supp. 2d 1171 (N.D. Cal. 2002) ............................................. 31

*London v. Carson Pirie Scott & Co.*,
   946 F.2d 1534 (Fed. Cir. 1991) ............................................................ 4

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ..................................................... 25, 26

*Manville Sales Corp. v. Paramount Sys., Inc.*,
   917 F.2d 544 (Fed. Cir. 1990) ........................................................... 17

*Maxwell v. J. Baker, Inc.*,
   86 F.3d 1098 (Fed. Cir. 1996) .............................................................. 7

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) ................................................................ 2

*Moore U.S.A., Inc. v. Standard Reg. Co.*,
   229 F.3d 1091 (Fed. Cir. 2000) ...................................................... 4, 10

*Mycogen Plant Sci., Inc. v. Monsanto Co.*,
   91 F. App'x 666 (Fed. Cir. 2004) ...................................................... 8, 9

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
   30 F.4th 1339 (Fed. Cir. 2022) ...................................................... 24, 26

*Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*,
   739 F.3d 694 (Fed. Cir. 2014) .............................................................. 8

- iii -

*Planet Bingo, LLC v. GameTech Int'l, Inc.*,
   472 F.3d 1338 (Fed. Cir. 2006) ........................................................... 10

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   904 F.3d 965 (Fed. Cir. 2018) ............................................................. 31

*Promega Corp. v. Life Techs. Corp.*,
   875 F.3d 651 (Fed. Cir. 2017) ............................................................. 31

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) ............................................................................. 2

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ............................................................. 27

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*,
   30 F.4th 1109 (Fed. Cir. 2022) ...................................................... 17, 18

*Rsch. Corp. Techs., Inc. v. Microsoft Corp.*,
   627 F.3d 859 (Fed. Cir. 2010) ............................................................. 18

*Schriber-Schroth Co. v. Cleveland Trust Co.*,
   311 U.S. 211 (1940) .............................................................................. 8

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001) ........................................................... 10

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
   251 F.3d 814 (9th Cir. 2001) .............................................................. 23

*Steuben Foods, Inc. v. Shibuya Hoppmann Corp.*,
   ___ F. Supp. 3d ___, 2023 WL 2498810 (D. Del. Mar. 14, 2023) ................. 3, 4

*TecSec, Inc. v. Adobe Inc.*,
   978 F.3d 1278 (Fed. Cir. 2020) ...................................................... 30, 31

*TQ Delta, LLC v. CISCO Sys., Inc.*,
   942 F.3d 1352 (Fed. Cir. 2019) ........................................................... 29

*Transclean Corp. v. Bridgewood Servs., Inc.*,
   290 F.3d 1364 (Fed. Cir. 2002) ........................................................... 23

*Tronzo v. Biomet, Inc.*,
   156 F.3d 1154 (Fed. Cir. 1998) .......................................... 18, 19, 20, 22

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
   69 F.3d 512 (Fed. Cir. 1995) .............................................................. 24

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
   520 U.S. 17 (1997) ......................................................................... 4, 10

- iv -

*White v. Dunbar*,
    119 U.S. 47 (1886) ........................................................................ 1

*Whitserve, LLC v. Comput. Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ....................................... 30, 31

*Yoon Ja Kim v. ConAgra Foods, Inc.*,
    465 F.3d 1312 (Fed. Cir. 2006) ................................................ 29

## STATUTES

35 U.S.C. § 271 ............................................................................ 15

35 U.S.C. § 284 ................................................... 24, 25, 27, 30

## OTHER AUTHORITIES

Fed. R. Civ. P. 50 ............................................................... 1, 13, 16

Fed. R. Civ. P. 59 .......................................................................... 1

# I.    __INTRODUCTION__

Defendant (Medtronic) renews its motion for judgment as a matter of law ("JMOL") under Rule 50(b) and, in the alternative, moves for a new trial under Rule 59.

This is a case where a patent—U.S. Patent No. 8,900,294 ("the '294 patent")—was twisted, like the proverbial "nose of wax," "so as to make it include something more than, or something different from, what its words express." *White v. Dunbar*, 119 U.S. 47, 51 (1886).  Among other things, Plaintiff (Colibri) turned a patent claiming "pushing" into one covering a device that strictly uses pulling, when it had long ago abandoned any efforts to obtain a claim that covered such pulling; it successfully urged this jury to find that parts of a valve undisputedly located outside of the stent nonetheless satisfied their claim's requirement "that *all portions* of the *valve* are *entirely within* the inner channel of the stent member"; and it obtained a plainly invalid claim to a "valve including two to four individual leaflets made of fixed pericardial tissue," when the written-description portion of its alleged priority document (like its patent) emphasizes at every turn that its leaflet portion may not be separate and "individual" leaflets, but instead must be "formed from a single piece of biocompatible valve material"—for otherwise, you "los[e] the novel and improved qualities of the present invention."  DX-153 at ¶ [0047].

This is accordingly a textbook case for this Court to apply the protections of Rule 50 and grant JMOL so that the words of the patent are not contorted, but honored.

Apart from these basic, fatal deficiencies in Colibri's case, there are several other failures of Colibri's proof that should also compel this Court to grant JMOL.  These failures are explained in greater detail below.  In brief:

- No reasonable jury could find that Medtronic actively induced physicians to infringe those claims—Medtronic neither instructed doctors to operate the devices in an infringing manner nor knew such conduct would

- 1 -

1    constitute infringement.  Colibri relies solely on evidence that Medtronic

2    knew of the '294 patent and the allegedly infringing conduct, but those

3    facts are legally insufficient to show active inducement.  *See Commil*

4    *USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 640, 642 (2015).

5    • U.S. Patent No. 5,855,601 ("Bessler") (DX-81), which Colibri copied

6    portions of, verbatim, renders the '294 patent obvious.

7    • If the Court allows the liability verdict to stand, it should at least grant

8    JMOL, or order a new trial, on damages.  Even assuming Colibri's expert

9    testimony was properly admitted, the jury's damages award is not based

10    on sufficient evidence—it relies on an improper royalty base, an

11    insufficiently comparable licensing agreement, and inadequate

12    information for ascertaining an appropriate royalty rate.

13    The Court should grant JMOL, or order a new trial.

14    **II.    <u>LEGAL STANDARD</u>**

15    JMOL is warranted "when the evidence, construed in the light most favorable

16    to the nonmoving party, permits only one reasonable conclusion, which is contrary

17    to the jury's verdict." *Hagen v. City of Eugene*, 736 F.3d 1251, 1256 (9th Cir.

18    2013) (quotation marks omitted).  In considering the evidence, "the court should

19    give credence to … evidence supporting the moving party that is uncontradicted

20    and unimpeached." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151

21    (2000) (quotation marks omitted).

22    A court may order a new trial where, *inter alia*, "the verdict is contrary to the

23    clear weight of the evidence." *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th

24    Cir. 1976) (quotation marks omitted).  The court has a "duty" to "set aside the

25    verdict of the jury, even though supported by substantial evidence, where, in the

26    court's conscientious opinion, the verdict is contrary to the clear weight of the

27    evidence." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007)

28    (alterations and quotation marks omitted).

- 2 -

### III.    ARGUMENT

#### A.    There Is No Direct Infringement As A Matter Of Law

No reasonable jury could find that users of the Evolut devices infringe the asserted claims because the Evolut devices cannot practice at least three claim limitations.

#### 1.    There Is No Infringement Of "Pushing Out The Pusher Member From The Moveable Sheath" (DOE Only)

Colibri acknowledges that the Evolut devices operate in a manner that falls outside the literal scope of the '294 patent's claims—during trial, it abandoned any allegation that the devices literally infringe the requirement of "pushing out the pusher member from the moveable sheath" (the "pushing" limitation).  Trial Transcript ("Tr.") 1431:4-9.  Instead, Colibri offered only a theory under the doctrine of equivalents ("DOE").  But the Evolut devices operate not just differently from the claims' "pushing" requirement, but the opposite—by *pulling*. Substantial, undisputed evidence establishes this.  *E.g.*, Tr. 372:2-373:7, 947:20-23. No reasonable jury could find otherwise.  Thus, there can be no infringement under the DOE as a matter of law.

***Opposites Cannot Be Equivalents.***  No reasonable jury could find that the Evolut devices are used to perform substantially the same function, way, and result as "pushing out the pusher member from the moveable sheath," which the Court construed to mean "pressing against the pusher member with a force *that moves the pusher member outward from the moveable sheath*."  Dkt. 97-1 at 58 (emphasis added).  Colibri's DOE theory is that *holding the pusher member steady*, while *"pulling" back the moveable sheath* to expose the "pusher member," is equivalent to "pushing" the pusher member out of the moveable sheath.  Tr. 529:3-531:23, 534:17-20.

Pulling and pushing, however, "are *antonyms* of each other, not equivalents." *See Steuben Foods, Inc. v. Shibuya Hoppmann Corp.*, ___ F. Supp. 3d ___, 2023

- 3 -

WL 2498810, at *2 (D. Del. Mar. 14, 2023) (granting JMOL of non-infringement under the DOE because no reasonable jury could find that "continuously" is equivalent to "intermittently"). The jury's finding that pulling is the equivalent of pushing "defies logic" and cannot stand. *Id.*; *see also Moore U.S.A., Inc. v. Standard Reg. Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) (holding that "the term 'majority' is not entitled to a scope of equivalents covering a minority" because "it would defy logic to conclude that a minority—the very antithesis of a majority— could be insubstantially different from a claim limitation requiring a majority, and no reasonable juror could find otherwise"). Colibri's equivalence theory, and the jury's verdict, "effectively eliminate[s]" the pushing limitation "in its entirety," which is legally improper. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co*., 520 U.S. 17, 29 (1997). Claim limitations must have meaning; otherwise they "will cease to serve their intended purpose." *London v. Carson Pirie Scott & Co*., 946 F.2d 1534, 1538 (Fed. Cir. 1991).

Colibri appears to have confused the jury with its argument—based solely on the say-so of Colibri's expert—of an allegedly equivalent "pushing" force, which Dr. Gallegos described as the pressure needed to overcome various "forces" acting on the valve as it is being deployed. Tr. 530:25-531:3, 538:17-539:19; *cf.* Dkt. 142-6 at ¶¶ 245-52, 269-79. But any such pressure applied to the Evolut devices does not "move[] the pusher member outward from the moveable sheath." In fact, that is impossible. *See* Tr. 958:16-20. Rather, Colibri's allegedly equivalent "pushing" force merely maintains the position of the valve while the sheath is retracted from—pulled off of—the valve. It does not (indeed, cannot) "move[] the pusher member outward from the moveable sheath." Only "pulling" the sheath from the valve frees the valve and allows it to self-expand outward. *See, e.g.*, Tr. 372:2-373:7, 947:20-23. There is, undisputedly, no separate "pushing" force applied to the valve.

- 4 -

1      Moreover, many—*if not all*—of the forces identified by Dr. Gallegos act on

2  the valve even when it is *not* moving.  Pressure from blood flow, for example, acts

3  on the valve whether it is moving or not.  Thus, it cannot be that the pressure

4  needed to overcome Dr. Gallegos's forces to maintain the position of the valve is

5  one that "*moves* the pusher member outward from the moveable sheath."

6      In his Report and Recommendation on Claim Construction, which the Court

7  adopted without exception, the Technical Special Master recognized the material

8  difference between a force that "*moves* the pusher member" and one that merely

9  *maintains* the position of the valve as the sheath is retracted.  Dkt. 97-1 at 52-53;

10  Dkt. 119.  According to the Special Master, the examiner who reviewed the '294

11  patent "appears to have … underst[ood] … that 'pushing out' refers not just to an

12  application of force," i.e., a maintaining force, "but rather to *actual movement*."

13  Dkt. 97-1 at 52-53 (emphasis added).  The Special Master found "the examiner's

14  distinction between 'pushing' and 'pulling/retracting' is noteworthy," *id.* at 52, and

15  added that "[t]he distinction … is also apparent in the specification" of the '294

16  patent, *id.* at 54-55.  Considering this and other evidence, the Special Master

17  concluded that it "weighs against [Colibri's] argument"—the same argument it has

18  made for an equivalent "pushing" force—"that the 'pushing out' limitation can be

19  met by a movement in which the pusher member remains stationary while a

20  retraction occurs (that is, wherein only the sheath moves while the pusher member

21  merely prevents the replacement heart valve from being retracted together with the

22  sheath)."  *Id.* at 56-57 (citation omitted).

23      Because no reasonable jury could find that the Evolut devices perform

24  substantially the same function, way, and result as the "pushing" limitation, there

25  can be no infringement under the DOE as a matter of law.

26      The equivalence issue also should not have reached the jury because two

27  independent legal limitations to the DOE, each of which is for the Court to decide,

28  preclude Colibri's equivalence arguments.

- 5 -

1    ***Prosecution History Estoppel.*** Prosecution history estoppel ("PHE")

2    "prevents a patent owner from recapturing with the [DOE] subject matter

3    surrendered to acquire the patent."  *Honeywell Int'l, Inc. v. Hamilton Sundstrand*

4    *Corp.*, 523 F.3d 1304, 1312 (Fed. Cir. 2008).

5           During prosecution of the '294 patent, the examiner rejected several claims

6    for lack of written description.  According to the examiner, Colibri's application

7    disclosed "two alternate methods of [valve] deployment": (l) "pushing the pusher

8    member/hollow tube catheter out of the moveable sheath to *partially* deploy the

9    valve, with the option of recovery," and (2) "pulling/retracting the moveable sheath,

10   allowing *full* expansion of the valve."  PX-4 at 2984-85.  Colibri was "combining"

11   these "different embodiments" in its claims, however, by claiming a method of

12   "retracting the moveable sheath to expose a portion of the valve device AND

13   recovering the portion of the valve within the moveable sheath."  PX-4 at 2984-85.

14   Because this partial-deployment-by-retraction method lacked written-description

15   support, the examiner rejected Colibri's claims.

16          Colibri *could have* responded by arguing that its application adequately

17   described this (unsupported) combination of steps.  After all, Colibri said it

18   disagreed with the examiner's rejection.  PX-4 at 3093.  But Colibri instead

19   cancelled the rejected partial-deployment-by-retraction claims and pursued only

20   claims to partial deployment by "pushing."  PX-4 at 3093.  Colibri thus forfeited all

21   claims directed to any method of "retracting the moveable sheath to expose a

22   portion of the valve device AND recovering the portion of the valve within the

23   moveable sheath."  PX-4 at 2984.  As the Special Master explained, "[e]ven if …

24   outward movement and retraction could be used in conjunction with one another,"

25   by cancelling its claims, Colibri did not "dispute[] the distinction identified by the

26   examiner between 'two alternate methods of deployment,'" Dkt. 97-1 at 52, thereby

27   forfeiting claims covering the combination of "outward movement and retraction."

28   Moreover, by cancelling its claims, Colibri withdrew the cancelled subject matter

- 6 -

from further scrutiny—meaning to the extent the subject matter was disclosed, it was dedicated to the public.  *See Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1108 (Fed. Cir. 1996) ("By failing to claim [disclosed] alternatives, the [USPTO] [i]s deprived of the opportunity to consider whether these alternatives were patentable.").

Notably, the unsupported partial-deployment-by-retraction method the examiner identified is the same method Evolut device users employ to partially deploy a replacement heart valve by retracting and, if necessary, to recapture and reposition the valve:  Look no further than the testimony of Colibri's witnesses for confirmation.  Tr. 334:4-7 (Fish testifying that "all of the[] Medtronic devices allow you to recapture and reposition the valve device"), 372:21-25 (Fish testifying that the valve is exposed by "pulling or retracting the capsule backward"), 484:10-487:3 (Gallegos testifying that "[i]n all of the Medtronic TAVR devices at issue here, when the device is being deployed, the first thing that happens when you get to the site of deployment is that partial exposure of the distal end of the replacement heart valve device"), 629:9-22 (Gallegos testifying that "[t]he Medtronic device is designed so that you turn the blue actuator, and the blue actuator retracts the capsule … to reveal the tip"); *see also, e.g.*, Tr. 519:17-520:8 (Gallegos testifying that retracting the capsule requires "something to restrain" (or hold) the stent steady to overcome friction caused by the stent "pushing outward against the capsule"), 608:8-18 (Gallegos testifying that without a "restraining force," the stent "would stick to the sheath" as it is being retracted).  Colibri therefore forfeited all claims covering the partial-deployment-by-retraction method practiced by Evolut device users.

Yet Colibri has sought here to recapture this same method using the DOE. That is forbidden:  PHE "prevents a patent owner from recapturing through the [DOE] subject matter surrendered to acquire the patent."  *Duramed Pharms., Inc. v. Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011).

- 7 -

1    In opposing summary judgment, Colibri resisted this conclusion on the

2    ground that, because it cancelled those claims rather than amending them,

3    cancellation did not "ha[ve] any effect on the literal claim scope of [the other] then-

4    pending [claims]."  Dkt. 148 at 15.  The Supreme Court has rejected Colibri's

5    argument.  In *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., 535 U.S. 722

6    (2002), the Court said that PHE "is a 'rule of patent construction' that ensures that

7    claims are interpreted by reference to those 'that have been *cancelled* or rejected.'"

8    *Id*. at 733 (emphasis added) (quoting *Schriber-Schroth Co. v. Cleveland Trust Co.*,

9    311 U.S. 211, 220-21 (1940)); *see also, e.g.*, *Pac. Coast Marine Windshields Ltd. v.*

10   *Malibu Boats, LLC*, 739 F.3d 694, 703 (Fed. Cir. 2014) ("[PHE] is not limited to

11   narrowing amendments, but extends as well to claim surrender.").  The Federal

12   Circuit's decision in *Mycogen Plant Science, Inc. v. Monsanto Co.*, 91 F. App'x

13   666 (Fed. Cir. 2004), is particularly instructive.  Patentee Mycogen cancelled

14   claims that "were rejected for lack of enablement."  *Id.* at 667.  Accused infringer

15   Monsanto argued that because Mycogen cancelled these claims, it "was barred by

16   [PHE] from asserting" the DOE.  *Id.*  Mycogen made the same argument Colibri

17   offered here:  "[I]t did not mean to surrender any subject matter by canceling [the]

18   claims …, since it continued to prosecute other claims … which were not the

19   subject of narrowing amendments."  *Id.*

20   The Federal Circuit disagreed.  It explained:  "[C]ancellation of claims for

21   reasons related to patentability in favor of claims with a narrower literal scope *has*

22   *the same presumptive effect on claim limitations as amending the claims directly*."

23   *Id.* at 668 (emphasis added); *see also id.* ("a voluntary amendment (or

24   cancellation)" can "give rise to [PHE]").  Thus, it was "immaterial that the claims at

25   issue … were not themselves amended to avoid patentability rejections, because

26   [the] broader claims … were canceled in response to a rejection for

27   unpatentability."  *Id.*  Accordingly, "the cancellation of [the broader]

28   claims … created a rebuttable presumption that all subject matter between the

- 8 -

pertinent limitations of the original claims and those of the final, issued claims was surrendered." *Id.*

So, too, here.  It is "immaterial" that Colibri cancelled claims covering the Evolut method of partial-deployment-by-retraction instead of amending them. Colibri cancelled those claims "in response to a rejection for unpatentability" and did so "in favor of claims with a narrower literal scope" not covering the Evolut method.  Like in *Mycogen*, Colibri cannot avoid the consequences of that choice by distinguishing between cancelling claims and amending them.  Nor can Colibri avoid these consequences by characterizing its cancellation decision as "not one of patentability but expediency."  Dkt. 148 at 15.  Obviously Colibri acted in response to the examiner's patentability rejection.

Colibri's summary-judgment opposition also argued that the alleged equivalent of "pressing the accused device's pusher member in conjunction with retracting of the moveable sheath" was not surrendered because the cancelled claims did not include "pushing on the pusher member." *See id.* at 14-15.  The Court credited this argument in denying summary judgment to Medtronic.  Dkt. 258 at 12-13; *see also* Dkt. 220-1 at 33, 39-40.  Respectfully, this argument, too, is incorrect.  First, the open-ended cancelled claim 39 covered retracting the moveable sheath to partially expose the replacement heart valve device without regard to whether a pushing force was applied to the pusher member to hold it in place.  PX-4 at 8-9.  Thus, by canceling claim 39, Colibri's alleged equivalent was surrendered. Second, as explained by Drs. Fish and Gallegos, retracting the moveable sheath to partially expose the replacement heart valve device and pusher member *necessarily* requires a pushing force be applied to the pusher member to hold it in place while retracting the moveable sheath.  *E.g.*, Tr. 313:23-315:18, 328:22-25, 519:17-520:8, 608:8-18.  This force is needed to overcome the frictional force between the moveable sheath and self-expanding stent that would otherwise cause the stent to move backward with the sheath as it was retracted.  Third, assuming the Evolut

- 9 -

devices meet the remaining limitations of Colibri's claims, as Colibri says they do, the Evolut devices necessarily experience the same forces—blood flow, ventricle contraction, organ movement, etc.—as the devices covered by Colibri's cancelled claims. Thus, Dr. Gallegos's discussion of these other forces acting on the Evolut devices, Tr. 538:17-539:19, is a red herring, as every force Dr. Gallegos identified would be experienced by any device covered by Colibri's cancelled claims. Therefore, canceling claim 39 necessarily resulted in the surrender of the alleged equivalent of "pressing the accused device's pusher member in conjunction with retracting of the moveable sheath."

Because Colibri cancelled claims covering the Evolut method of partial-deployment-by-retraction, PHE renders the DOE unavailable to Colibri for the "pushing" limitation.

***Claim-Vitiation Rule.*** Additionally, Colibri cannot use the DOE to cover the Evolut devices, as doing so would vitiate (that is, nullify) the "pushing" limitation. "[A]n element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005) (citing *Warner-Jenkinson*, 520 U.S. at 29). As discussed above, pulling is the opposite—the "antithesis"—of pushing. *See Moore U.S.A.*, 229 F.3d at 1106. So the "pushing" limitation cannot be extended so that pulling is an equivalent. *See Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1345 (Fed. Cir. 2006) (affirming non-infringement where the "proposed application of the [DOE] would change 'before' to 'after'"; noting that "[t]his court has refused to apply the doctrine in other cases where the accused device contained the antithesis of the claimed structure"); *Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005) (affirming a "ruling that the [DOE] cannot be extended to reach an 'unmounted' system ... without vitiating the 'mounted on' limitation altogether"); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1346-

- 10 -

47 (Fed. Cir. 2001) ("[T]he [DOE] cannot be employed in a manner that wholly vitiates a claim limitation.  Thus, if a patent states that the claimed device must be 'non-metallic,' the patentee cannot assert the patent against a metallic device on the ground that a metallic device is equivalent to a non-metallic device." (citations omitted)).  This is especially true here, where Colibri—and the examiner—treated "pushing the pusher member" as distinct from "pulling/retracting" to deploy the valve.  *See* PX-4 at 2984–85, 3093.

Because equating the method of "pulling" the moveable sheath with "pushing" would vitiate the "pushing" limitation, the rule against claim vitiation renders the DOE unavailable.

### 2.  There Is No Infringement Of "Valve Residing Entirely Within An Inner Channel Of The Stent Member" (Literal Only)

For the "residing entirely within an inner channel of the stent member" limitation (the "entirely within" limitation), Colibri asserted only a literal-infringement theory.  No reasonable jury could find the Evolut devices meet this limitation, because parts of the valve are not "entirely within" that inner channel.  Colibri's expert effectively admitted this when testifying about the inner skirt and commissure pads.  *See* Tr. 574:1-5, 12-17, 576:12-19, 589:15-25; *see also* Tr. 588:11-22.

The Court construed the "entirely within" limitation to mean "residing such that *all portions* of the *valve* are *entirely within* the inner channel of the stent member."  Dkt. 97-1 at 37 (emphases added).  The Court construed "valve" as "portions of the replacement heart valve device that *allow the one-way flow of blood*."  *Id.* at 15 (emphasis added).  So if any portion of the device that "allow[s] the one-way flow of blood" is not "entirely within the inner channel of the stent member," there can be no infringement.  Undisputed evidence showed that the skirt

- 11 -

and pads are parts of the valve that are not "entirely within the inner channel of the stent member."

*Inner skirt*:  In the Evolut devices, parts of their inner skirt reside *outside* of the stent.  Dr. Gallegos agreed that "part of the skirt is outside" the stent. Tr. 574:12-17.  Thus, the parties' disagreement boils down to whether the inner skirt is part of the "valve," i.e., whether it "allow[s] the one-way flow of blood."

The inner skirt is undisputedly part of the valve.  There is no dispute that "one-way" blood flow is allowed only if *two* things are true: (1) blood is permitted to flow in one direction, and (2) blood is prevented from flowing backwards (or in any other direction).  Tr. 583:3-18 (Gallegos agreeing that to "allow the one-way flow of blood," "two corresponding states" must exist: (1) "the blood must be allowed to flow forward … from the heart to the aorta through the valve," and (2) "the blood must be stopped from flowing back from the aorta back into the heart").  The inner skirt is part of the "valve" if it contributes to achieving either condition.  The evidence established, without dispute, that it does.  The Evolut devices thus do not satisfy the "entirely within" limitation, as a matter of law.

Dr. Gallegos testified that the inner skirt functions as a seal to prevent paravalvular leak, that is, blood flow around the device.  Tr. 584:9-586:1.  Thus, the skirt satisfies both conditions identified by Dr. Gallegos.  First, by preventing blood flow around the device, the inner skirt channels blood through the leaflets to facilitate blood flow in one direction.  Medtronic's senior product-development manager in charge of designing the Evolut implants, Kshitija Garde, testified that the inner skirt operates as a seal "that allows the blood to flow through it towards the leaflets so [the] leaflets could open and enable that one-way flow."  Tr. 888:4-12.  Dr. Gallegos similarly admitted that the skirt allows the forward flow of blood past the leaflets.  Tr. 583:19-584:8.  The inner skirt thus works together with the leaflets to allow blood flow in one direction.  Tr. 891:9-12, 19-24.  That was undisputed.

- 12 -

The inner skirt similarly prevents blood flow around the device in the reverse direction. The inner skirt "channels … the blood coming backwards through the leaflets so the leaflets could close and prevent that backward flow. So [the skirt] plays a significant role in enabling one-way flow." Tr. 890:25-891:3; *see also* Tr. 890:18-24. This functionality is likewise undisputed. That is why Dr. Gallegos *admitted* that the inner skirt "allows one-way flow of blood." Tr. 589:15-19. He also repeatedly testified that only a *malfunctioning* skirt could allow blood flow in "multiple directions," Tr. 582:7-589:1; *see also* Dkt. 142-6 at ¶ 167 n.16—yet Colibri has no infringement theory based on a malfunctioning device.

In its Rule 50(a) opposition, Colibri downplayed the inner skirt's contribution to "one-way" blood flow, asserting that "a seal 'by definition … stops flow' and 'something that stops flow cannot allow flow.'" Dkt. 427 at 2 (citing Tr. 501:10-16) (ellipsis in original). That misses the point. Because the skirt "stops flow" *around* the valve and allows blood *through* the valve in the forward direction, blood is directed through the leaflets in one direction and is prevented from returning—exactly how Dr. Gallegos defined the phrase "allow the one-way flow of blood." *See* Tr. 490:17-21 (defining "allow the one-way flow of blood" to mean "allow[ing] blood to flow through the valve, but not come back"). The inner skirt therefore "allow[s] the one-way flow of blood" precisely *because* it is a seal—and Dr. Gallegos agreed. Tr. 589:15-29. The inner skirt is therefore part of the "valve." No reasonable jury could find otherwise. And since the inner skirt indisputably does not reside "entirely within the inner channel of the stent member," JMOL is compelled.

Colibri's Rule 50(a) opposition tried to confuse this issue, citing Medtronic's statements to the FDA and in other materials, to argue that only the leaflets are the "valve." Dkt. 427 at 3-4. These statements were not made in the context of the '294 patent or this litigation; they were made long before this case, and before the Court defined "valve" in the '294 patent. They are irrelevant.

- 13 -

The only issue is whether the inner skirt meets the Court's definition of "valve." All the evidence shows that it does. A reasonable jury would be compelled to find that the inner skirt, which indisputably does not reside "entirely within the inner channel of the stent member," is part of the "valve." JMOL is warranted.

*Commissure pads:* The same is true for the commissure pads—it is undisputed that parts of the commissure pads reside outside of the stent, Tr. 574:1-5, 576:8-11, and a reasonable jury would be compelled to find that the commissure pads allow for one-way flow of blood. Colibri failed to show otherwise, and indeed, like the inner skirt, the pads permit blood flow in multiple directions only when they malfunction. PX-771 at 1-42; *see also* Dkt. 130-1 at 16-21. Moreover, it is undisputed that the leaflets are part of the "valve," and, as Dr. Hillstead and Ms. Garde testified, the commissure pads "are part of the leaflets." Tr. 885:3-19; *see also* Tr. 894:15-898:14, 904:7-906:10, 925:10-19, 926:19-927:18, 1186:3-12, 1194:12-1195:5. In fact, the two are integrated, with each leaflet-and-commissure-pad pair formed from a single piece of material. *See* PX-30 at 1-36.

### 3.  There Is No Infringement Of "Attached To A Proximal Portion Of The Stent Member" (Literal Only)

Colibri's expert testimony also establishes non-infringement, as a matter of law, of the limitation requiring that the valve be "attached to a proximal portion of the stent member." Dr. Gallegos specifically distinguished the proximal portion of the stent member from the central portion, and explained that the proximal portion of the stent member is above the central portion. Tr. 596:12-22. He then testified that no portion of the valve is attached above the central portion of the stent member. Tr. 599:2-24. Dr. Gallegos instead testified that the commissure pads— which he claimed are *not* part of the valve—are attached to a proximal portion of the stent member. Tr. 655:7-22.

- 14 -

Considering Dr. Gallegos's trial testimony, the only way Colibri could possibly support this infringement theory is to admit that the commissure pads are part of the valve. But that would simply be another admission—in addition to its expert's admissions on the inner skirt—that the "entirely within" limitation is not met. Either way, the verdict lacks sufficient evidence to sustain infringement with respect to this claim limitation.

## B.    The Evidence Shows No Active Inducement As A Matter Of Law

Even if Colibri had proven third-party direct infringement, its infringement claims—which assert only induced infringement—would still fail, because no reasonable jury could find that Medtronic instructs doctors to perform the claimed methods or that Medtronic intended to induce infringement. *See* 35 U.S.C. § 271(b). Colibri's abandonment of its willful-infringement claim reinforces its failure of proof.

### 1.    There Is No Evidence That Medtronic Instructs Doctors To Infringe

To show inducement, Colibri highlighted Medtronic's instructions regarding use of the accused devices. But those instructions did not direct doctors to infringe. Specifically, Medtronic does not instruct doctors to push out a pusher member from the moveable sheath—neither in its Instructions for Use, nor its field trainings. *E.g.*, Tr. 963:6-9 ("Q. Is there any instruction … about pushing or moving the inner member … outward from the capsule …? A. No …."), 964:11-13, 1045:13-18, 21-24.

Medtronic instead instructs doctors to *pull back* (retract) what Colibri calls the moveable sheath. *See, e.g.*, Tr. 1044:12-14. That is the opposite of the claimed "pushing out" method, and cannot amount to an instruction to practice the asserted claims. *See* Part III.A.1, *supra*.

Colibri therefore lacks any evidentiary support to show Medtronic actively induced doctors to infringe.

- 15 -

### 2.    There Is No Evidence That Medtronic Specifically Intends Doctors To Infringe

Colibri also failed to show specific intent to cause another to infringe. Colibri's acknowledgement that it could not prove willful infringement reflects this gap in proof.

Specific intent to induce infringement "requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). It is not enough for a plaintiff to establish that "the defendant knew of the patent" at issue; the plaintiff must "pro[ve] the defendant knew the acts [at issue] were infringing." *Commil USA*, 575 U.S. at 640, 642. A defendant cannot intentionally induce infringement if it "reads the patent's claims differently from the plaintiff, and that reading is reasonable," even if the defendant "knew the acts might infringe." *Id.* at 642. The Supreme Court has been "clear in rejecting any lesser mental state as the standard." *Id.*

No reasonable jury could find Colibri proved the requisite intent. In opposing Medtronic's first Rule 50(a) motion, Colibri pointed only to evidence that Medtronic knew of the patent and the conduct at issue. Dkt. 427 at 8. That is legally insufficient. *See, e.g.*, *Civolution B.V. v. Doremi Labs, Inc.*, No. CV14-00962, 2015 WL 11090912, at *14 (C.D. Cal. June 4, 2015) (evidence "that [d]efendant knew of the patent and knew that its customers would use the accused functionality" fails to meet the requisite intent element for induced infringement as a matter of law).

All of the evidence refutes Colibri's case. Medtronic's witnesses testified that Medtronic believed there was *no infringement* of Colibri's patent. *See* Tr. 921:19-21 (Garde) ("Q. [H]ave you ever believed that doctors using the Evolut R have been infringing Colibri's patent? A. No."), 994:15-17 (Casley) ("Q. [D]id you ever believe that doctors who used the Evolut R system were infringing Colibri's patent? A. No."). Colibri, which bore the burden, offered no contradictory

- 16 -

1    evidence of intent.

2    Moreover, Colibri never claimed that Medtronic's non-infringement

3    positions are objectively unreasonable.  Nor could it.  By the end of trial, even

4    Colibri agreed it could not show literal infringement, retreating to the DOE for a

5    key limitation.  *See* Part III.A.1, *supra*.  There is thus no dispute that Medtronic's

6    products did not literally infringe any claim.  And that is fatal to Colibri's

7    intentional-induced-infringement case.  To "know" of the infringement, Medtronic

8    would have had to not only interpret the plain language of the patent itself, but also

9    predict application of the DOE—a complex doctrine that "renders the scope of

10   patents less certain," because "[i]t may be difficult to determine what is, or is not,

11   an equivalent to a particular element of an invention."  *Festo*, 535 U.S. at 732.

12   Colibri presented no evidence that anyone at Medtronic knew or even believed

13   doctors were using the products in an infringing manner under the DOE.

14   Medtronic's position that there was no infringement is thus particularly

15   reasonable—further precluding any reasonable jury from finding intent to infringe.

16   *See, e.g.*, *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1307 (Fed. Cir. 2006);

17   *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990).

18   As yet more evidence precluding any finding of intent, Colibri engaged

19   Medtronic in discussions about the '294 patent, but intentionally never told

20   Medtronic that Colibri believed Medtronic was infringing, "[b]ecause [Colibri]

21   w[as] trying to partner with Medtronic."  Tr. 699:15.  So Medtronic was not even

22   on notice that *anyone* understood the patent to cover the accused products.  There is

23   thus no evidence that Medtronic even knew its products might be used to infringe—

24   and certainly no evidence sufficient to support a willful-blindness theory.  *Cf.*

25   *Global-Tech*, 563 U.S. at 769 (describing the high bar for willful blindness).

26   Finally, Colibri's abandonment of its willfulness claim only cements the

27   absence of evidence of the intent element.  In *Roche Diagnostics Corp. v. Meso*

28   *Scale Diagnostics, LLC*, 30 F.4th 1109 (Fed. Cir. 2022), the Federal Circuit

- 17 -

1  reversed an induced-infringement judgment as "irreconcilable" with a finding that

2  the infringement was not willful, noting that "the intent standard for inducement is

3  akin to the one for willfulness, as both rest on the subjective intent of the accused

4  infringer." *Id.* at 1119.

5      Colibri failed to satisfy the intent element of induced infringement.  This

6  compels JMOL of non-infringement for Medtronic.

7      **C.    The Paniagua Application Anticipates The Claims As A Matter of**

8          **Law**

9      JMOL of invalidity is warranted because the Paniagua application anticipates

10  all asserted claims.  *See Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159-60 (Fed. Cir.

11  1998); *see also Bamberg v. Dalvey*, 815 F.3d 793, 797-98 (Fed. Cir. 2016); *Rsch.*

12  *Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869-72 (Fed. Cir. 2010).  Just

13  like in *Tronzo*, the Paniagua application does not provide written-description

14  support for the asserted claims, and therefore cannot serve as a priority document to

15  the patent.  Instead, it is anticipating art—Colibri does not dispute anticipation if

16  the Paniagua application does not adequately describe the asserted claims.  The

17  Court is aware of the dispositive facts in *Tronzo*.  These facts bear repeating,

18  because they are present in the Paniagua application in spades.

19      *First*, *Tronzo* found significant that the patent described the "invention" in

20  limited terms, not broadly to include various permutations.  That patent

21  "describe[d] the invention as a 'trapezoid,' a 'truncated cone,' or a cup of 'conical

22  shape.'"  156 F.3d at 1159.  Here, the Paniagua application repeatedly describes the

23  "invention" as a leaflet valve formed by folding a single uncut piece of

24  biocompatible material.  *See, e.g.*, DX-153 at ¶¶ [0024], [0026], [0047].  Dr. Fish's

25  testimony underscores this point.  Tr. 306:21-307:15, 400:5-23.  The following

26  passage in the Paniagua application is illuminating:

27      [T]he inventors have discovered that *as long as* the leaflet portion of

28      the valve itself is formed from a single piece of biocompatible valve

- 18 -

1    material, the other portions of the valve can be formed by suturing of

2    one or more separate pieces of material without losing the novel and

3    improved qualities of the present invention.

4    DX-153 at ¶ [0047] (emphasis added).  In other words, although "other portions of

5    the valve can be formed by suturing," the leaflet portion of the valve must be

6    "formed from a single piece of biocompatible valve material"; otherwise, you

7    "los[e] the novel and improved qualities of the present invention."  *Id.*  This is why

8    *every* issued claim from the Paniagua application requires valve leaflets formed of

9    "a single sheet of biocompatible pericardium tissue."

10        *Second*, *Tronzo* emphasized the patent's disclosure of a small number of

11   species.  That patent "disclose[d] only two species of cups: an 'eccentric cup,'

12   which has a top lip shorter than the bottom lip, and a 'true' cup, with all sides being

13   equal."  156 F.3d at 1159.  The Paniagua application is even more limited,

14   disclosing only one type of leaflet valve—one formed by folding a single uncut

15   piece of material.  *See, e.g.*, DX-153 at Abstract, ¶¶ [0024], [0026], [0037], [0047].

16   Even the "alternate" embodiments described in the Paniagua application have "a

17   leaflet forming layer made of a single piece of valve material."  *Id.* at ¶ [0047].

18        *Third*, *Tronzo* looked to the patent's disparagement of other species,

19   discussed in the background section of the patent.  Its "only reference … to

20   different shapes is a recitation of the prior art.  Instead of suggesting that

21   the … patent encompasses additional shapes, the specification specifically

22   distinguishes the prior art as inferior and touts the advantages of the conical shape

23   of the … cup."  156 F.3d at 1159 (citation omitted).  Here, too, the Paniagua

24   application's only reference to different leaflet valves is in discussing the prior

25   art—specifically, repeatedly disparaging and distinguishing the prior art as inferior

26   compared to its single uncut leaflet valve.  *E.g.*, DX-153 at ¶¶ [0023], [0024],

27   [0026], [0047].

28        The same determinative features that guided the Federal Circuit's analysis in

- 19 -

*Tronzo* are present in the Paniagua application. *Tronzo* controls, and it compels JMOL.

Likewise, in *Bamberg*, the Federal Circuit explained that a patentee "theoretically could possess" an "'undesired' embodiment'" by, for example, "including it in the description of a preferred embodiment in the specification." 815 F.3d at 798. "For purposes of the written description requirement," however, the claimed invention must "be described sufficiently to show that the applicant was in possession of the invention." *Id.* (quotation marks omitted). Thus, "Bamberg does not possess a white layer that melts below 220°C because it specifically distinguished [those layers] as producing an 'undesired' result." *Id.* Moreover, inventor "testimony confirms that [the] invention did not include a white layer that melted below a threshold of 220°C." *Id.*

The Paniagua application makes clear that, like the lower-melting-point layers in *Bamberg*, "tissue valves … constructed by cutting or suturing" are undesired. DX-153 at ¶ [0023]. Moreover, like *Bamberg*'s inventor testimony, Dr. Fish's testimony confirms that the invention is a leaflet valve formed by folding a single uncut piece of biocompatible material. Tr. 307:2-7, 400:20-23.

In its summary-judgment-motion reply (Dkt. 154 at 7), Colibri argued that *Tronzo* is inapplicable because the Paniagua application is more like the patent in *Cordis Corp. v. Boston Scientific Corp.*, 188 F. App'x 984 (Fed. Cir. 2006) (unpublished). Nothing of the sort is true. In *Cordis*, the patent disclosed "two inventive components" for its general subject matter of improving arterial stents, each with distinct benefits: (1) "undulating longitudinal sections (touted for their ability to enhance stent flexibility)," and (2) "ring shaped stent structures (touted for their ability to enhance stent strength)." *Id.* at 990. Each of these components provided a distinct improvement over the prior art, and "nothing in the patent suggest[ed] that the benefits of [one were] tied in any way to [the other]." *Id.*

The Paniagua application, however, discloses only a single arguably

- 20 -

inventive concept—a single uncut leaflet valve—and states that the "novel and improved qualities of the present invention" can only be realized by that single concept.  DX-153 at ¶ [0047].  According to Colibri, the '294 patent (and its identical specification in the Paniagua application) discloses two "distinct inventions": (1) a "method for controlled release during percutaneous implantation of a replacement heart valve device," and (2) a "leaflet-folding technique."  Dkt. 154 at 7.  These are not "distinct inventions"—the claimed method for controlled release is inextricably tied to the single uncut leaflet valve formed by the disclosed leaflet-folding technique.  PX-1 at 11:40-12:2; DX-153 at ¶ [0058].  Dr. Fish even testified that the "leaflet-folding technique" was the "lightbulb" idea that allowed him to make a valve device "small enough" to perform his surgeries.  Tr. 305:16-306:6, 306:25-307:7.  *Cordis* itself recognized that such patents, where "the benefits of" one disclosure are "tied" to others, do not give rise to distinct inventive components.  188 F. App'x at 990; *see also Akeva L.L.C. v. Nike, Inc.*, 817 F. App'x 1005, 1010 (Fed. Cir. 2020) (construing patent to exclude "permanently fixed" rear sole shoes because of "the patent's disparagement of conventional fixed rear sole shoes which suffer from rear sole wear, its characterization of the invention as a removable and/or rotatable rear sole, and its uniform, lengthy disclosure of such rear soles" (quotation marks omitted)).

Dr. Fish's testimony also underscores that the "method" lacks any inventiveness independent of the leaflet-folding technique.  He admitted that Colibri did not invent percutaneous heart-valve-replacement surgeries, nor methods of controlled release.  Those had been performed for years prior to the Paniagua application.  *See* Tr. 388:22-390:9.  Moreover, numerous patents, like Bessler (1996), had already issued covering various methods of performing these same procedures.  *See* DX-81 at 2:26-29, 4:60-5:6.  Dr. Fish further testified that other researchers were pursuing the same "idea of putting a valve somehow mounted on a catheter that could be put into the body."  Tr. 305:7-13.  No matter how Colibri

- 21 -

seeks to characterize it, the Paniagua application describes only one arguably inventive concept—the "leaflet-folding technique."

Colibri's summary-judgment motion also argued that the "disclosure of a single species can support a claim to a broader genus." Dkt. 122-1 at 3-4. But *Tronzo* is a specific limit on this general rule. Otherwise, *Tronzo*'s disclosure of a "conically shaped cup" would have supported claims to a "generic-shaped cup hip implant." They did not.

Because the Paniagua application fails to provide written-description support for the full scope of the "valve including two to four individual leaflets made of fixed pericardial tissue" limitation of the asserted claims, PX-1 at 14:3-4, the '294 patent cannot claim priority to the Paniagua application. Rather, the Paniagua application is prior art that anticipates the asserted claims as a matter of law. JMOL of invalidity is thus warranted.

### D.     Bessler Renders The Claims Obvious As A Matter Of Law

JMOL of invalidity should be granted for another reason: Bessler renders all asserted claims obvious as a matter of law. Bessler itself and the testimony of Medtronic's technical expert, Dr. Hillstead, demonstrate this. Dr. Hillstead provided a detailed, element-by-element analysis of how Bessler discloses and renders obvious the asserted claims. Indeed, large swaths of Bessler were copied verbatim into the '294 patent. Tr. 393:7-398:8.

Notably, Colibri never disputes that Bessler teaches the vast majority of limitations. Its expert, Dr. Dasi, disputed only that Bessler did not teach the valve: (1) "collapsed onto the pusher member," or (2) "able to be recaptured into the movable sheath." Tr. 1386:14-1387:5. But no evidence supports those opinions. Regarding the first, Dr. Dasi admitted that he narrowly construed "collapsed onto" to mean "wrapped around." Tr. 1427:2-1428:7. But this was not part of any claim construction, and Dr. Hillstead testified that Bessler discloses a valve device "collapsed onto the pusher member." Tr. 1242:12-1245:13. As to the second,

- 22 -

1    Dr. Hillstead testified that the only disclosure in the '294 patent regarding

2    "recapturability" was taken verbatim from Bessler.  Tr. 1218:6-12.  Dr. Fish

3    admitted as much, testifying that the '294 patent's disclosure concerning

4    "recovering [the valve] back into the sheath" "was literally copied word for word

5    from the Bessler patent."  Tr. 413:4-12; *see also* Tr. 398:1-8.  The only conclusion

6    reasonably supported by the record is that Medtronic proved by clear and

7    convincing evidence that Bessler invalidates the '294 patent as a matter of law.

8         **E.    At Minimum, A New Trial Is Warranted Because The Liability**

9              **Verdict Is Against The Clear Weight Of The Evidence**

10        Were the Court to decline to grant JMOL of no liability, it should at least

11    order a new trial because "the verdict is contrary to the clear weight of the

12    evidence."  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814,

13    819 (9th Cir. 2001) (quotation marks omitted).

14        As detailed above, the clear weight of the evidence shows no direct

15    infringement of the asserted claims, that in any event Medtronic did not induce

16    infringement with knowledge that the acts at issue constituted infringement, and

17    that the claims are both anticipated and obvious.  Because the jury's liability

18    holding was thus contrary to the clear weight of the evidence, the Court should

19    grant a new trial on all issues.

20        **F.    The Court Should Order JMOL, Or At Least A New Trial, On**

21              **Damages**

22        Were the Court to maintain the liability verdict, it should at minimum reject

23    the jury's damages award, which is not supported by legally sufficient evidence.

24        **1.    Colibri's Evidence Of Damages Was Inadequate**

25        The patentee "ha[s] the burden of proving the amount of reasonable royalty

26    damages it is entitled to recover."  *Transclean Corp. v. Bridgewood Servs., Inc.*,

27    290 F.3d 1364, 1376 (Fed. Cir. 2002).  Damages awards cannot be "based upon

28    speculation or optimism, but must be established by evidence."  *Hebert v. Lisle*

- 23 -

1  *Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996). "Although th[e 'reasonable royalty']

2  analysis necessarily involves an element of approximation and uncertainty, a trier

3  of fact must have some factual basis for a determination of a reasonable royalty,"

4  meaning the ultimate "rate determined by the trier of fact must be supported by

5  relevant evidence in the record." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512,

6  517 (Fed. Cir. 1995). Because Colibri presented insufficient evidence of damages,

7  the jury's damages award is necessarily based on speculation. It cannot stand.

8       As Medtronic showed in its *Daubert* papers, the opinions of Colibri's sole

9  damages expert, Dr. Vellturo, were too unreliable to be admitted. *See* Dkt. 152,

10  239, 321, 332. For that reason alone, the jury's damages award is improper. *See,*

11  *e.g.*, *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 974 (Fed. Cir. 2022) (vacating jury's

12  damages award based on unreliable expert testimony). Even assuming

13  Dr. Vellturo's testimony was properly admitted, Colibri still failed to provide

14  adequate evidence to support damages. *See, e.g.*, *Enplas Display Device Corp. v.*

15  *Seoul Semiconductor Co.*, 909 F.3d 398, 411 n.2 (Fed. Cir. 2018) (recognizing that

16  even properly admitted expert testimony may be inadequate to support a jury

17  verdict). Here, the flaws in Dr. Vellturo's testimony—the sole evidence offered by

18  Colibri for calculating alleged damages—fatally undermine the damages award.

19       *First*, the damages verdict impermissibly includes in the royalty base

20  products used only for non-infringing activity. "[W]here[, as here,] the only

21  asserted claim is a method claim, the damages base should be limited to products

22  that were actually used to perform the claimed method." *Niazi Licensing Corp. v.*

23  *St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022). "The royalty base

24  for reasonable royalty damages cannot include activities that do not constitute

25  patent infringement, as patent damages are limited to those 'adequate to

26  compensate for the infringement.'" *AstraZeneca AB v. Apotex Corp.*, 782 F.3d

27  1324, 1343 (Fed. Cir. 2015) (quoting 35 U.S.C. § 284). Where the claims at issue

28  are method claims, the plaintiff thus "ha[s] the burden to prove that the extent to

- 24 -

which the infringing method has been used supports the … damages award." *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1335 (Fed. Cir. 2009).  While that proof need not identify "specific instances of infringement proven with direct evidence," it must be more than just "speculation." *Id.* at 1334.

This is so even if a broader royalty base "reflects what a [licensor] would have agreed to in a real licensing negotiation."  *AstraZeneca*, 782 F.3d at 1343; *see also Enplas*, 909 F.3d at 411.  That is, even if Dr. Vellturo is correct that the parties would have agreed to a royalty payment on every sale, rather than only on sales of products later used in an infringing manner, that does not mean Colibri is entitled to that full amount as § 284 *patent damages*.  In *AstraZeneca*, for example, the Federal Circuit did not doubt that a *real-world* licensor and licensee for the pharmaceutical patent at issue would have agreed to a license—and thus royalty payments—during the period of statutory pediatric exclusivity, which extended past the patent's expiration.  782 F.3d at 1343.  Similarly, in *Enplas*, the Court did not dispute that the parties in the *real world* would most likely have agreed to a "freedom-to-operate license" that extended beyond the products and patents at issue in the litigation.  909 F.3d at 411.  Nonetheless, in each case, the Court rejected the damages awards based on these theories, because regardless of what parties would have agreed to, a "'royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement, as patent damages are limited to those "adequate to compensate *for the infringement*."'"  *Id.* (emphasis added) (quoting *AstraZeneca*, 782 F.3d at 1343).

*Hanson v. Alpine Valley Ski Area, Inc*., 718 F.2d 1075 (Fed. Cir. 1983), which Colibri relied on in opposing Medtronic's motion to exclude Dr. Vellturo's testimony, *see* Dkt. 332 at 14, does not suggest otherwise.  In *Hanson*, there was no dispute that each of the three snowmaking machines practicing the patented method had *actually been used* in an infringing manner.  *See* 718 F.2d at 1077.  The question was how to calculate the damages the defendant was required to pay on

each of those infringing machines:  whether the royalty had to be calculated on a per-use basis or if it could be calculated based on a per-machine basis, despite variations in the amount of actual use.  *Id.* at 1080.  The plaintiff did not seek damages for machines that *never* infringed; the only question was whether the defendant was entitled to pay less for machines that it used less often.  *Id.*  The Federal Circuit held it was not error to apply a uniform royalty rate across all three machines.  *Id.*

    The Federal Circuit has reiterated more recently that, under *Hanson*, royalties can be based on a rate that does not vary according to "whether the invention is used frequently or infrequently by the consumer" after the sale.  *Lucent Techs.*, 580 F.3d at 1334.  But this prospect does not and cannot open the door to recovering royalties for a product that is *never used to infringe at all*, and thus is not subject to patent damages for infringement.  The Federal Circuit has repeatedly maintained that such non-infringing activity cannot constitute *any portion* of the royalty base. *See, e.g.*, *Niazi*, 30 F.4th at 1357 (rejecting damages award where there was insufficient evidence of infringing versus non-infringing uses of the products to "allow a reasonable approximation of the damages base," because "patentees cannot recover damages based on sales of products with the mere capability to practice the claimed method").

    There is no question here that the jury relied on "sales of products with the mere capability" to infringe, even where the product was never actually used to infringe.  *Id.*  Record evidence reflects that, at most, the accused method is used only in 30-40% of procedures, meaning that 60-70% of the time there is *non-infringing* use.  Tr. 537:12-17, 786:24-787:2.  Because each product can be used only once, 60-70% of products are *never* used in an infringing manner.  While the jury did not award the full amount of damages requested by Colibri, it awarded precisely 50%.  Tr. 770:17 (Vellturo proposing $212,978,000), 1649:4-7 (jury award of $106,489,000).  Whether the jury reduced the royalty base or the royalty

- 26 -

1    rate (or both), that award is manifestly improper and unsupported by the evidence.

2           At best for Colibri, the jury adopted Dr. Vellturo's proposed royalty rate and

3    discounted his proposed royalty *base* by 50%, instead of discounting it to 30-40%

4    as it should have.  If that was the jury's approach, the base still includes products

5    never used in an infringing way, even on Colibri's account—the jury's base is 10 to

6    20 percentage points higher than it should be.  Applying Dr. Vellturo's rate to such

7    an excessive base means a sizable portion of the award, and possibly close to half

8    of it, is improper.

9           More likely, though, since the jury could have no reasonable basis to select

10   50% of Medtronic sales for a royalty base (no such evidence was presented), the

11   jury adopted a lower royalty *rate* and applied it to the *full set of Medtronic's sales*.

12   In that event, 60-70% of the damages award reflects products never used to

13   infringe.

14          In short, however one understands the jury's award, it cannot be justified as

15   proper § 284 damages covering only products used in an infringing manner.

16          *Second*, the sole anchor for a supposed "reasonable royalty" came from a

17   settlement agreement (the Edwards-Medtronic agreement) nowhere near

18   comparable to a hypothetical Colibri-Medtronic license that it could serve as a

19   reliable basis for a damages award.  To start, the Edwards-Medtronic agreement is a

20   litigation settlement—and the Federal Circuit has expressed "longstanding

21   disapproval of relying on settlement agreements to establish reasonable royalty

22   damages."  *LaserDynamics, Inc. v. Quanta Comput., Inc*., 694 F.3d 51, 77 (Fed.

23   Cir. 2012).  Such agreements can thus be relied on only in "certain limited

24   circumstances."  *Id*.  An expert relying on such an agreement thus bears an even

25   greater burden than usual to demonstrate its comparability to the hypothetical

26   license at issue, including by ensuring that it is possible to "account[] for the

27   technological and economic differences between those licenses" and the

28   hypothetical negotiation.  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 873

- 27 -

(Fed. Cir. 2010).  Here, that gap was too large to span, and Colibri provided no evidence to guide the jury to any proper conclusions based on the Edwards-Medtronic agreement.

Consider first that Edwards and Medtronic are "head-to-head competitors in the U.S. TAVR market," and in fact "have the only FDA-approved commercial TAVR devices."  Tr. 833:7-16.  Thus, "[i]f someone in the U.S. wants to use a[n] FDA-approved TAVR device, there are two options …. There's Medtronic and Edwards."  Tr. 834:9-13.  The only other alternative would be to "not do a TAVR procedure" at all.  Tr. 834:14-15.  All Medtronic sales thus directly reduce the potential market for Edwards sales—a key factor that would be reflected in any license between those two companies.  By contrast, "Colibri is a startup that does not have any products on the market," Tr. 825:19-21, so it does not (and cannot) compete with Medtronic.

Further, the Edwards-Medtronic license was a wide-ranging settlement involving *18 U.S. patents* spread across three patent families, all of which were based on the work of inventors who were foundational to the world of TAVR, Tr. 826:19-827:17, as well as rights to worldwide patents and patent applications, Tr. 828:20-830:4.  Many of the licensed patents were apparatus patents, meaning the patent would be infringed, absent a license, by every apparatus sold. Tr. 811:12-24.  Here, there is only a single U.S. patent, no foreign rights, and only induced infringement of method claims was alleged, with alleged infringement actually occurring for at most 30-40% of the products sold.  Tr. 830:5-8, 537:12-17, 786:24-787:2.

Even accepting Colibri's expert's dubious testimony that the technology at issue was broadly similar, Colibri still failed to establish that the Edwards-Medtronic license was sufficiently comparable to serve as the basis of a damages award.  Because the jury had no other evidence to turn to, its damages award necessarily rests on an improper basis.

1    *Finally*, Colibri failed to provide adequate evidence to allow the jury to

2    adjust the Edwards-Medtronic agreement to reflect the circumstances of a

3    hypothetical Colibri-Medtronic license.

4        Although Dr. Vellturo asserted that he had accounted for various differences

5    between the Edwards-Medtronic agreement and the hypothetical negotiation in

6    selecting his 6% royalty rate, he offered no meaningful explanation of *how* these

7    factors affected his analysis.  Rather, Dr. Vellturo opined only that, "at the end of

8    the day, the negotiation outcome, I'm kind of sitting at the table saying, Here's

9    where I think this would come out, and that's where 6 percent comes from."

10   Tr. 821:22-25.

11       Dr. Vellturo's generic, conclusory, "[h]ere's where I think this would come

12   out" testimony regarding differences between the agreements at issue cannot

13   support the jury's verdict, because "[c]onclusory expert testimony does not qualify

14   as substantial evidence."  *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1358

15   (Fed. Cir. 2019).  A jury's verdict cannot be supported by "generic statements" of

16   an expert; those are "too conclusory to sustain the jury's verdict."  *Krippelz v. Ford*

17   *Motor Co.*, 667 F.3d 1261, 1269 (Fed. Cir. 2012); *see also Yoon Ja Kim v. ConAgra*

18   *Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (affirming JMOL for defendant

19   where plaintiff's expert offered only conclusory testimony).

20       Dr. Vellturo acknowledged that Edwards and Medtronic are competitors, that

21   Colibri and Medtronic are not, and he insisted that he "made [his] adjustments"

22   based on this fact.  Tr. 835:4-9.  But he only said that competition would affect a

23   royalty rate "depend[ent] on a number of factors," and is "a matter of degree."

24   Tr. 834:16-835:9.  What "factors" and what "degree"?  He did not say.  Similarly,

25   when purportedly accounting for differences between the number and types of

26   patents at issue in the Edwards-Medtronic license, Dr. Vellturo testified broadly

27   that "[p]atents have different values," Tr. 830:10, and that "from a technical and

28   capability standpoint, the inventions that are covered by these three sets of patents

- 29 -

are comparable in terms of significance to the product to how the '294 patent is incorporated into the products," Tr. 811:1-7.  Yet neither Dr. Vellturo nor Colibri's technical expert, Dr. Dasi, gave the jury any guidance about the relative contributions of the 18 different patents in the Edwards-Medtronic license, or the differences between apparatus claims and method claims, for evaluating royalty rates.  Even Dr. Vellturo's testimony on the value of the '294 patent itself was too scanty to assist the jury—he focused broadly on "the ability to recapture and reposition," not the specific contributions of the '294 patent over the prior art, *e.g.*, Tr. 783:12-15, even though nearly all steps of the claimed method were indisputably known and disclosed in the prior art, *see, e.g.*, Tr. 393:7-398:8.

"'[S]uperficial testimony' and the simple recitation of royalty numbers that happen to be in the ballpark of the jury's award will not support the jury's award." *Whitserve, LLC v. Comput. Packages, Inc*., 694 F.3d 10, 32 (Fed. Cir. 2012).  As the Federal Circuit holds, "reciting each factor and making a conclusory remark about its impact on the damages calculation before moving on does no more than tell the jury what factors a damages analysis could take into consideration."  *Id*. at 31.  Under these circumstances, the testimony "encourage[s] the jury to reach a purely speculative judgment."  *Id*. at 32.  Just so here:  Absent reasoned testimony regarding the impact of each factor on the reasonable royalty, the jury's award is not supported by sufficient evidence.

## 2.    The Court Should Grant Medtronic JMOL That Colibri Failed To Establish A Reasonable Royalty Above Zero Dollars

Given Colibri's failure to carry its burden on its damages theory as a matter of law, Colibri is not entitled to any damages.  Colibri has not offered any alternative evidence from which damages could be calculated.  Section 284 "does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts."  *TecSec, Inc. v. Adobe Inc*., 978 F.3d 1278, 1291 (Fed. Cir. 2020).  "[A] patent owner may waive its right to a damages award when

1  it deliberately abandons valid theories of recovery in a singular pursuit of an

2  ultimately invalid damages theory."  *Id.* (quoting *Promega Corp. v. Life Techs.*

3  *Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017)).  Here, Colibri deliberately opted to

4  pursue an improper all-sales royalty base tied to an inadequately adjusted royalty

5  rate.  That approach left the jury without any sufficient evidence to support a

6  damages award.  "Where the record lacks any evidence of a reasonable royalty rate,

7  the Federal Circuit has approved of awarding 'zero damages.'"  *Bos. Sci. Corp. v.*

8  *Johnson & Johnson*, 550 F. Supp. 2d 1102, 1120 (N.D. Cal. 2008); *see also LG*

9  *Elecs., Inc. v. Advance Creative Comput. Corp.*, 212 F. Supp. 2d 1171, 1179 (N.D.

10  Cal. 2002) (awarding no damages where patentee provided no competent evidence

11  on amount of damages).

12      The Court should thus grant JMOL to Medtronic on the issue of damages and

13  award Colibri zero dollars.

14      **3.    At Minimum, The Court Should Grant A New Trial On Damages**

15      Alternatively, the Court should grant a new trial on damages.  Courts take

16  this approach where a jury's damages award is unsupported.  *See, e.g.*, *Power*

17  *Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 980 (Fed.

18  Cir. 2018) (remanding for new trial where "the evidence presented [on damages]

19  was insufficient as a matter of law"); *Whitserve*, 694 F.3d at 33-34 ("vacat[ing] the

20  award and remand[ing] for a new trial on damages" where award was "the result of

21  sheer surmise and conjecture").

22  **IV.    CONCLUSION**

23      The Court should grant Medtronic judgment as a matter of law.  At

24  minimum, the Court should order a new trial on both liability and damages.

25

26

27

28

- 31 -

1  Dated:  April 13, 2023

2

3                                                By: */s/ Martin M. Ellison*

4                                                Mark D. Fowler (SBN 124235)
                                                 mark.fowler@dlapiper.com
5                                                **DLA PIPER LLP (US)**
                                                 2000 University Avenue
6                                                East Palo Alto, CA 94303-2250
                                                 T: (650) 833-2000 | F: (650) 833-2001
7

8                                                Kathryn Riley Grasso (SBN 211187)
                                                 kathryn.riley@dlapiper.com
9                                                **DLA PIPER LLP (US)**
                                                 401 B Street, Suite 1700
10                                               San Diego, CA 92101
                                                 T: (619) 699-2700 | F: (619) 699-2701
11

12                                               Martin M. Ellison (SBN 292060)
                                                 martin.ellison@dlapiper.com
13                                               **DLA PIPER LLP (US)**
                                                 2000 Avenue of the Stars, Suite 400, N.
14                                               Tower
                                                 Los Angeles, CA 90067
15                                               T: (310) 595-3000 | F: (310) 595-3300

16                                               Attorneys for Defendant Medtronic
                                                 CoreValve LLC
17

18

19

20

21

22

23

24

25

26

27

28

                                    - 32 -

1

## <u>CERTIFICATE OF COMPLIANCE (L.R. 11-6.2)</u>

2       The undersigned, counsel of record for Defendant Medtronic CoreValve

3  LLC, certifies that this brief contains 9,999 words, which complies with the word

4  limit set by court order dated March 29, 2023.

5

6  Dated:        April 13, 2023              By:  */s/ Martin M. Ellison*

7                                                Martin M. Ellison (SBN
                                                 292060)
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28